**Robert S. MISKIMEN, et al.,
Appellants,**

v.

**The KANSAS CITY STAR COMPANY,
et al., Respondents.**

**No. WD 34230.**

Missouri Court of Appeals,
Western District.

Nov. 7, 1984.

Motion for Rehearing and/or Transfer to
Supreme Court Overruled and Denied
Dec. 26, 1984.

Application to Transfer Denied
Feb. 26, 1985.

had the right and the power to terminate its contracts with the plaintiffs, independent subscription carriers of the company's newspapers. The court further declared that the company by its conduct over the years had created an expectation that the carriers who had purchased their routes would have a reasonable time in which to recoup their investments before the company could exercise its right to cancel a carrier's contract. The carriers claim that they have a property interest in their subscription routes, that their contracts are terminable only for cause and that they are not the company's agents but independent contractors. Relying upon an express termination clause in its contracts, the company contends that it has the power and right to terminate the carriers' contracts. The carriers appeal. We reverse.

The carriers raise six points on appeal. First, the trial court erred in declaring that the company has the right and power to cancel the contracts at issue since it waived its express contractual right to cancel the contracts upon four days notice and is estopped from invoking that provision. Similarly, the carriers contend that custom, usage and course of dealing between the parties have modified the contracts so that the contracts are only terminable for cause. Their third point is that they are agents of the newspaper who have an interest in their routes, making their relationship not terminable at will. Finally, they contend that the recoupment is not the proper remedy and that the carriers have a right to recover the fair market value of their routes as a result of the defendant's cancellation. We find merit in their first point and therefore address only that point.

The Kansas City Star Company, owned by respondent Capital City Communications Company, is the publisher of the major evening and morning newspapers in Kansas City, Missouri. The plaintiffs are independent subscription carriers of the company's newspapers and its exclusive distributors in designated territories. The carriers deal directly with the subscribers in their respective areas and are respon-

Laurence R. Tucker (argued), Steven G. Emerson, Kansas City, for appellants.

John T. Martin, Sam L. Colville (argued), Gary L. Whittier and Dennis R. Dow, Kansas City, for respondents.

Before PRITCHARD, P.J., and MANFORD and NUGENT, JJ.

NUGENT, Judge.

In a declaratory judgment action tried to the court without a jury upon a stipulation of facts and submitted exhibits, the court declared that the defendant newspaper publisher, The Kansas City Star Company,

sible for building up a list of subscribers, obtaining the necessary equipment and hiring needed employees to service their routes. Each carrier purchases the needed number of papers at a wholesale price set by the company, and since 1968 the carriers have set their own retail subscription rates.

The carriers have all signed form contracts that varied only in their respective designations of the routes and the wholesale prices. All of the contracts contain an explicit provision that reads as follows, "Second Party [the company] shall have the right to cancel the contract at any time, by giving four days notice of its intention to do so," or a similar termination clause requiring thirty days notice. The company prepared and furnished the form contracts. The forms of the contracts were never the subject of independent negotiations; they were tendered to the carriers on a take-it-or-leave-it basis. Before 1977, the company had regularly exercised its right under the foregoing clause to terminate whenever it raised the wholesale price, but only then. Over the years, the company's practice was to inform the carriers that it was terminating the contracts then in force but was willing to sign new contracts with the carriers with an increase in wholesale rates. The forms of the new contracts would be identical to existing contracts except for the change in the wholesale price. Once again, the contracts were offered on a take-it-or-leave-it basis not subject to negotiation. The relationship between the carriers and the publisher began in the 1880's and remained virtually unchanged until 1977 when the company sought to implement a new delivery system.

The stipulation of facts includes excerpts from the deposition of Roy D. Wasmer, the company's circulation clerk from 1933 to 1940 and circulation manager from 1952 to 1962. He testified that during the thirty-two years he worked in city circulation the form and wording of the contracts did not change except for the wholesale price. William L. Cook, one of the plaintiff carriers, first entered into a contract with the company on April 4, 1923, and signed his tenth and the last one on June 1, 1974.

The first nine contracts, dating from 1923 until 1957, are identical in wording and form except for differences in wholesale prices. The 1974 contract has some changes in form but its provisions are similar to the earlier contracts. The parties have agreed that Mr. Cook's contracts are representative of the contracts used during the period they cover.

The essence of the carriers' contentions is that they have more than a mere contract right to deliver the defendant's newspapers, that they have a proprietary interest in their routes or at least have been induced by the company's conduct to expect that they have such an interest and to rely upon having it. This proprietary interest or expectation, they contend, prevents the company from exercising the termination clause in a way it has never before done. In its memorandum opinion, the trial court found that the carriers do have a proprietary interest in their routes.

For decades, the parties have treated the carriers' interests in their routes as more than mere contract rights terminable at the company's will. Over the years, the practice has been for the carriers to buy and sell their routes. As a rule, a sale occurred this way: first, the carrier would enter into a separate sales agreement with a proposed buyer. The carrier would then propose to the company that the buyer take over the carrier's route and enter into a contract with the company to service the route. The company would check the buyer's credit references and ability to service the route. Once it had satisfied itself that the buyer was credit-worthy and able and the buyer posted a bond, the company would contract with the buyer. In almost every case, the company would accept the buyer offered by the carrier. In the few cases where it did not accept a proposed buyer, the company allowed the carrier to find a new buyer.

In many instances, the company took a more active role in the sales of routes. The trial court found that the company

gave advice to prospective buyers[1] on the values of routes and on occasion proposed that the carriers sell unprofitable segments of their routes. The company also put potential buyers in touch with sellers and published classified advertisements announcing the sales of routes. Upon a sale, it would provide the carrier with the legal forms used to transfer the route.

Judge O'Leary wrote in his memorandum opinion that

[t]hrough the years the value of these routes increased substantially. The purchase price of a route increased from approximately $5.00 per subscriber in the 1940's to $50.00 per subscriber in the mid-sixties to over $100.00 per subscriber in May of 1974. The observation was made that the routes were going for as high as $200,000.00 to $300,000.00 at the time of cancellation. The immediate, direct and foreseeable effect of the Star's announcement was the destruction of the market for sale of the carriers' routes and contracts.

The trial court further found that the carriers used their routes as collateral for loans. Once a carrier and a lender had agreed on a secured loan, the lender would inform the publisher in writing of its security interest in the route. The company would place the letter in the carrier's file and inform the lender of any sale of the route that occurred before the loan was fully paid. At least on one occasion, the company acknowledged in writing that the lender had a security interest in the route. In 1977, however, the company changed its practice. After that, upon being advised of a security agreement concerning a route, it would inform the lender that it did not acknowledge the lender's claimed security interest.

The Star also allowed and encouraged the carriers' designation of their spouses or children as successors to their routes upon a carrier's death. The company provided the forms used in making such designations. If a carrier failed to make a designation, it would offer the carrier's route to the carrier's surviving spouse or children. If the survivors did not want to operate the route, they had the option to sell the route.

The trial court also found that the company's management approved and made public statements acknowledging the carriers' ownership of their routes. In 1947, a minority of the carriers sought to be designated by the National Labor Relations Board as a bargaining unit and to unionize the carriers. That effort was opposed by the publisher and a majority of the carriers. The Star's position in that controversy was that the carriers were not its employees but were independent business persons who owned their own routes. The trial court in this case found that the company's position in the N.L.R.B. case was that the carriers' contracts were the chief if not the sole factor that gave value to their routes. Judge O'Leary noted that the company argued in the N.L.R.B. case that

while the contract uniformly contains an explicit right of termination by the company, in actual practice the contract has uniformly continued until the sale of the route by the route owner. In its brief in this case, the Star stated,

"they have, (the carriers) in the course of dealing over the many years acquired and owned unquestioned and universally recognized vested property rights in their routes. The fact is so firmly established, well known, and generally recognized in the community that local commercial bankers lend their funds on the security of these routes, and there is a strong demand for them at very substantial sums."

The company espoused that position at a carrier union organizational meeting, in published statements in its papers and in hearings before the National Labor Rela-

---

**1.** In November of 1953, the Director of Circulation for the Star sent a letter to an attorney representing a carrier regarding the carrier's selling his route. The letter in part said: "If, in fact, Mr. Frazee has changed his mind and now does desire to sell his route, he being the owner of it, is, of course free to do so to any suitable and competent person, at such price and on such terms as he may choose."

tions Board. The NLRB eventually ruled in favor of the publisher and found that the carriers were not its employees.

In less dramatic circumstances, the company also publicly maintained that the carriers owned their routes. In 1951, it published a brochure on the history of the newspaper. There it described the subscription delivery system, saying that

[i]n the city the picture is much the same, on a compressed scale. Trucks owned and operated by The Star deliver the paper rapidly to key intersections where the neighborhood routes start. Independent contract carriers owning their routes, buying the papers and responsible for their delivery, pick up the bundles. The number of subscribers varies by route from a few hundred to several thousand and the carriers employ their own boys and men to facilitate the door to door delivery in Kansas City.

In September of 1977, the publisher informed its carriers that it was terminating its contracts with them as of December 1, 1977. The company planned direct delivery of its publications to its subscribers by way of independent delivery agents. The trial court found that the immediate, direct and foreseeable effect of that announcement was the destruction of the market for sale of the carrier's routes and contracts. The company offered the carriers new contracts as delivery agents under the new system.

In its September, 1977 letter to the carriers, the company stated that its hope was that the carriers would continue to receive the same income under the new system they received under the former system. The new contracts were offered on a take-it-or-leave-it basis and were not subject to independent negotiations. The proposed contract form provided that the contract was unassignable and not subject to sale or hypothecation. Soon after the announcement, the carriers filed this suit.

■ Count II of plaintiffs first amended petition was severed and tried to the court without a jury upon stipulation of facts and numerous exhibits. In a court tried case upon a stipulation of facts, the only question before a reviewing court is whether the trial court drew the proper legal conclusions from those facts. *Schroeder v. Horack*, 592 S.W.2d 742, 744 (Mo.1979) (en banc); *Western Casualty & Surety Co. v. Kohm*, 638 S.W.2d 798, 799 (Mo.App.1982). We can only address the legal consequences of the stipulated facts and submitted exhibits. *Schroeder, supra*, 592 S.W.2d at 744.

In the present case, the trial court found that the carriers do not have a contractual right of endless duration to deliver the defendant's publications and that the company has the right and power to terminate the contracts. The court further declared that the carriers have a protectible interest in their contracts and their routes. Finally, the court declared that by its conduct over the years, the defendant created an expectation that a purchaser of a route would have a reasonable time under his or her contract to recover his initial investment before the company had the right to cancel the contract. The court left for future decision what that reasonable time would be under the facts of each particular contract.

The legal issue in this case concerns the duration of the contracts and whether the company had the right to terminate these contracts without cause in accordance with the termination clause. Our first step is to determine the legal relationship between the parties. That relationship does not neatly fit into the pigeon holes of principal and agent, master and servant, or a sales and exclusive distribution relationship. On the one hand the carriers are independent business persons who own their own equipment, hire their own employees, set retail prices, and independently develop their own lists of subscribers. The company exercises no control over the retail distribution to subscribers by the carriers so long as the carriers satisfactorily service their routes. In other aspects, the carriers appear to be the publisher's agents. They exclusively distribute its publications in certain geographic areas, they buy the papers they need at the company's wholesale prices,

and by their terms the contracts under which they operate purport to allow the company to cancel without cause upon requisite notice. The Missouri Supreme Court in *Skidmore v. Haggard,* 34 Mo. 837, 110 S.W.2d 726 (1937), held that for purposes of tort liability the carriers were not the company's servants but independent contractors.

Courts in other jurisdictions have called this type of relationship either a true sales agency or a sales and distribution relationship. *See* A.L.R.3d 196; 9 *Williston, A Treatise on the Law of Contracts,* (3rd ed. 1967 Cum.Supp.1984) (hereinafter *Williston* ), § 1017(A), at 137–39. Despite certain distinctions between these two relationships, for purposes of determining the duration of contracts between the parties, they are the same, and cases on either type of contract are authoritative. *Superior Concrete Accessories, Inc. v. Kemper,* 284 S.W.2d 482 (Mo.1955); 9 *Williston, supra,* § 1017(A), at 138. Williston points out that the courts have dealt with five situations involving the issue of termination: (1) where a definite time is fixed on both sides; (2) where a determinable time is fixed on one side only; (3) where the agreement contains no provision whatever for its termination; (4) where the agreement, otherwise sufficiently definite as to duration, reserves to one of the parties a right to prior cancellation; (5) where no definite time for termination is fixed on either side, but the contract provides that it may be cancelled by either party at will or upon proper notice or upon written notice, or for designated cause, or for dissatisfaction. 9 *Williston, supra,* § 1017(A), at 137 et seq. The contracts at issue here fit within the fifth category.

■ The general rule for the duration of contracts of indefinite duration is that they can be terminated at will upon the giving of the required notice. 9 *Williston, supra,* § 1017(A), at 137–39.

This was essentially the conclusion of the trial court. The trial court stated in its memorandum opinion, that *Staroske v. Pulitzer Publishing Co.,* 235 Mo. 67, 138 S.W.

36 (1911), and *Meyer v. Pulitzer Publishing Co.,* 156 Mo.App. 170, 136 S.W. 5 (1911), formed the "bedrock" of its decision in this case. Both cases concerned a newspaper's termination of a contract with its carriers. In both cases the terms of the carriers' contracts had no definite period of duration. The court in each case recognized the general rule that, where no time is fixed at which an agreement is to end, the agreement is terminable at the will of either party. *Staroske, supra,* 138 S.W. at 39; *Meyer, supra,* 136 S.W. at 7. In each case the court characterized the parties' relationship as principal and agent.

Although it involved a termination for cause, the *Meyer* decision also states that even though the principal can at will revoke a contract of indefinite duration, he may not do so until the agent has had sufficient opportunity to recoup any of his expenses incurred and the value of any labor expended in good faith induced by the principal. *Id.* at 9. The rule was followed in *Superior Concrete Accessories, Inc. v. Kemper,* 284 S.W.2d 482 (Mo.1955), and in *Beebe v. Columbia Axle Co.,* 117 S.W.2d 624 (Mo.App.1938).

■ The terminable at will contract discussed in this decision is not voidable on grounds of a lack of mutuality. 9 *Williston, supra,* § 1017(A). Binding promises exist on both sides of the agreement. The agent promises to set up a distribution or retail system through his own efforts and expenditures. The manufacturer or supplier promises that the distributor will exclusively distribute its product in a designated area; therefore, the manufacturer gives up its right to use other means of distribution. Finally, the parties are presumed to contract with the applicable law of contracts in mind at the time of agreement. *Union Pacific R.R. v. K.C. Transit Co., Inc.,* 401 S.W.2d 528, 534 (Mo.App.1966).

The fleshing out of the general rules does not solve our case but only provides a framework for our decision. The carriers seek to prevail on the ground that the general rules do not control the unique facts or the circumstances before us. They

propose several theories which they say take this case out of the foregoing general rules. We take up only the first of those—estoppel.

The carriers raise the interrelated doctrines of promissory estoppel, equitable estoppel, and waiver. The trial court found in references to these claims,

> There is no evidence that the Star company has ever expressly promised not to cancel a contract or to forever adhere to one system of newspaper delivery. There is no evidence before this Court of an admission, statement or act by the Star Company which is inconsistent with its claim that, as a party to an indefinite term contract, it has the right to terminate that contract in order to effect necessary changes for the future distribution of its newspapers. Accordingly, the Court holds that the Star Company is not estopped from exercising its rights. There is no "Injustice" which arises from the exercise by the Star Company of its rights.

We cannot agree. The correct legal conclusion to be drawn from the stipulated facts and exhibits is that the company's position here is dramatically inconsistent with its conduct toward the carriers from the 1880's until 1977. The company is equitably estopped from invoking the termination provision of its contracts with the carriers. Since we find for carriers on the ground of equitable estoppel, we need not address the interrelated issues of promissory estoppel and waiver.

As we begin our consideration of the applicability of the doctrine of estoppel, we note that the facts in neither *Staroske v. Pulitzer Publishing Co., supra,* 138 S.W. 36, nor *Meyer v. Pulitzer Publishing Co., supra,* 136 S.W. 5, justified application of the principles of estoppel. Estoppel was not considered in either case.

■ The doctrine of equitable estoppel followed in Missouri has been stated as follows:

> "Equitable estoppel" or "estoppel in pais" is that condition in which justice forbids that one speak the truth in his own behalf. It stands simply on a rule of law which forecloses one from denying his own expressed or implied admission which has in good faith and in pursuance of its purpose been accepted and acted upon by another. *Brooks v. Cooksey, Mo.,* 427 S.W.2d 498. To constitute estoppel in pais, three things must occur: first, an admission, statement or act inconsistent with a claim afterwards asserted and sued upon; second, action by the other party on the faith of such admission, statement or act; and third, injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement or act. *Emery v. Brown Shoe Company, Mo.,* 287 S.W.2d 761, 767 [2, 3]; *State ex inf. Shartel ex rel. City of Sikeston v. Missouri Utilities Company* (banc), 331 Mo. 337, 53 S.W.2d 394, 399 [9–11]; 31 C.J.S. Estoppel § 67, p. 405; *White v. Smith,* Mo.App., 440 S.W.2d 497, 503.

*Peerless Supply Co. v. Industrial Plumbing & Heating Co.,* 460 S.W.2d 651, 665–66 (Mo.1970). An equitable estoppel cannot arise unless justice demands it; it cannot be used as a sword to create or work a positive gain for the claimant but can only act as a shield to protect him from a loss which he could not otherwise escape. *Caraveo v. Dumas-Milner Chevrolet Corp.,* 377 S.W.2d 482, 485 (Mo.App.1964). The purpose of estoppel is to restore the parties to the same relative positions that they would have occupied if the basis for estoppel had not existed. *Shaffer v. Hines,* 573 S.W.2d 420, 422 (Mo.App.1978). A party may be estopped by conduct from claiming rights or benefits arising out of a contract. *Sharp v. Interstate Motor Freight System,* 442 S.W.2d 939, 946 (Mo.1969) (en banc).

■ No definition of estoppel, however, can be completely satisfactory. An equitable estoppel rests largely on the facts and circumstances of the particular case, thus any attempted definition usually amounts to no more than a declaration of an estoppel under those facts and circumstances. *State ex rel. Consolidated School District*

*v. Haid*, 31 Mo. 739, 41 S.W.2d 806, 808 (1931).

The particular facts and circumstances of this case furnish the base upon which we find that the company is equitably estopped.

*First*, the company's position that it can terminate these contracts at will upon notice is almost totally inconsistent with its actual conduct for over ninety years. From the 1880's until 1977, the company maintained that the carriers had a proprietary interest in and owned their routes. The company approved of and actively participated in the carriers' practice of selling their routes. It countenanced the practice of the carriers' use of their routes as collateral and until 1977 acknowledged that lenders could have a security interest in such routes. It treated those routes as property subject to being passed to members of a carrier's family upon his death, even providing the forms that the carriers used to designate a successor. It regularly contracted with those successors upon the carrier's death. Finally, in several instances, it represented in its statements and publications that the carriers owned their routes. The trial court found that the carriers have a property interest in their routes.

Now, for the first time, the company claims that the carriers have no property interest at all but merely a contract right that is terminable at will, a position entirely inconsistent with its words and actions recognizing the continuing property interest of the carriers for over ninety years.

■ The *second* element necessary to raise equitable estoppel is reliance. One claiming an estoppel must have acted in reliance and to his detriment upon the admission or conduct of the one estopped. *Peerless, supra,* 460 S.W.2d at 666. The party claiming estoppel must have been misled to his prejudice. *White v. Smith,* 440 S.W.2d 497, 504 (Mo.App.1969). The party must have changed his position:

> Finally there must have been some definite act on the part of the party claiming

the estoppel, in reliance on the representation of the estopped party, which has changed his condition for the worse. He must have suffered a legal detriment; but the legal detriment must not be merely formal, as it is in the case of the doctrine of consideration in the law of contracts, but actual. His condition must be such that, if the estoppel be not permitted, he will suffer damage.

*Block v. Block,* 593 S.W.2d 584, 589 (Mo. App.1979), quoting from *State on Inf. McKittrick ex rel. City of California v. Missouri Utilities Co.,* 339 Mo. 385, 96 S.W.2d 607 (1936) at 615.

The reliance element may be satisfied by examining the entire history of the relationship of the publisher with its carriers. All of the carriers purchased their routes from former carriers. The practice of the company up until 1977 was to acknowledge and acquiesce in the carriers' claims of ownership of the routes. By 1977 the prices paid for some of the routes was between $200,000 and $300,000. No one in his right mind would purchase anything for such a large sum believing that his right to keep and work and continue to profit from the property could be terminated upon four days notice. Nothing could be more obvious than that the carriers in purchasing the routes and in devoting their lives and fortunes to build their businesses acted in reliance on the company's previous owners' and managers' explicit and implicit representations and acts giving assurance that the contractual relationship was a lasting one and not subject to unilateral termination without cause.

■ Reliance may also be shown by the fact that the one claiming estoppel will suffer an actual loss if the company is not estopped. *Missouri Utilities, supra,* and *Block, supra.* The injury to the carriers that will result if the company is not estopped is clear. The market value for the routes was abruptly destroyed by the attempted cancellations. The company has offered to enter into contracts with the

carriers as delivery agents in a direct delivery system. It "hopes" that the delivery agents will realize the same income they realized under the independent carrier system. Nevertheless, the carriers have suffered an injury in that they no longer have the ability to sell their routes.

In finding an estoppel in this case we do nothing more than leave the parties in the position that they were before the company's decision to change its delivery system. *Caraveo, supra,* and *Shaffer, supra.* The carriers are not being awarded any new right or given a positive gain but are only being allowed to retain what they always had. To permit the company to change its delivery system without compensating the carriers for the loss of their businesses would be manifestly unfair.

The unfairness of the situation is further emphasized by the fact that the termination provision was never the subject of bargaining or negotiation. The Star's conduct created a reasonable expectation in the carriers that the relationship was not merely one of a contract terminable at will. It created a reasonable expectation that each carrier owned a business that could be conveyed and sold in the knowledge based upon over ninety years of history that the carrier's business would continue so long as the company's business continued and so long as the individual carrier performed his part of the bargain.

For the foregoing reasons, we hold that the company cannot terminate its contracts with its carriers at will without cause. Accordingly, we reverse the judgment of the trial court and remand the case to the circuit court with the direction that judgment be entered for each of the plaintiffs in accordance with the prayer of Count II of the first amended petition (declaratory judgment) and for such further proceedings as are not inconsistent with this decision.

All concur.