Lee WEICHT and Elizabeth Weicht,
et al., Plaintiffs/Appellants,

v.

SUBURBAN NEWSPAPERS OF
GREATER ST. LOUIS, INC. and
Journal Register Company, Defendants/Respondents.

No. ED 77618.

Missouri Court of Appeals,
Eastern District,
Division Four.

Oct. 10, 2000.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Nov. 9, 2000.

Application for Transfer Denied
Dec. 27, 2000.

Marvin L. Lindmark, III, Law Office of Bobroff, Hesse, Lindmark & Martone, Clayton, for respondents.

Richard C. Witzel, David Anthony Dimmitt, Paul K. Travous, Alan G. Kimbrell, Law Office of Witzel, Kearns, Kenney & Dimmitt, St. Louis, for appellants.

SHERRI B. SULLIVAN, Judge.

Lee and Elizabeth Weicht and 116 other appellants (collectively "Appellants") appeal from a trial court judgment granting summary judgment for Suburban Newspapers of Greater St. Louis, Inc. ("Suburban Newspapers") on Count II, conversion, of their petition and dismissing for failure to state a claim Count I, tortious interference with an economic expectancy, and Count III, property damage, of their petition. Appellants also appeal the trial court's dismissal of the Journal Register Company ("Journal") for lack of personal jurisdiction. We affirm in part and reverse and remand in part.

Beginning in the early 1980's, Appellants became independent contract carriers for Suburban Newspapers. Their contracts provided Appellants with the exclusive right to distribute newspapers within a defined geographic area and to sell those distribution rights. Appellants allege that for many years prior to their lawsuit, Sub-

urban Newspapers was aware of and fostered the purchase and sale of its delivery routes. Appellants also allege that various actions by Suburban Newspapers culminating in 1994 destroyed the value of their routes, specifically, by:

announcing its intention to destroy the portion of its newspaper distribution system that utilizes independent contract carriers who have ownership interests in their routes; intentionally breaching its contracts with a large number of Appellants, including reducing the number of newspapers made available to Appellants to deliver to all the residences and businesses on Appellants' routes and refusing to pay amounts agreed to in the distribution contracts; limiting renewal contracts to 30–day periods; substantially reducing the pay schedules in renewal contracts; hiring persons without ownership interests to deliver routes; permitting non-owner carriers to pick up their newspapers ahead of Appellants; and obstructing Appellants' efforts to sell their routes.

Appellants allege that these actions by Suburban Newspapers became widely known among carriers and prospective purchasers of Appellants' routes, rendering them unable to be sold.

Appellants divide their point one on appeal into three sections. Appellants' point IA does not identify the trial court ruling or action that they challenge, as required by Rule 84.04(d).[1] Accordingly, Appellants have not preserved anything for appellate review under point IA.

Appellants' point IB argues that the trial court erred in granting summary judgment to Suburban Newspapers on Count II, conversion, of their claim because its ruling was based on Suburban Newspapers not taking possession of the routes, and thus the trial court overlooked the fact that destruction of property constitutes conversion.

---

1. All rules references are to Mo.R.Civ.P.2000, unless otherwise indicated.

■ This Court reviews summary judgment essentially *de novo* because the propriety of summary judgment is purely an issue of law. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). The record is reviewed in the light most favorable to the party against whom judgment was entered, and that party is given the benefit of all reasonable inferences from the record. *Id.* Evidence presented in support of the motion is taken as true unless contradicted by the non-moving party's response to the motion. *Id.* The moving party bears the burden of proving that it is entitled to judgment as a matter of law and that no genuine issues of material fact exist. *Id.* at 382. A genuine issue exists where the record contains competent materials which evidence two plausible, but contradictory, accounts of the essential facts. *Id.* A genuine issue is not an argumentative, imaginary, or frivolous dispute. *Id.*

■ Where the moving party is the defending party, it may establish a right to summary judgment by showing facts that negate any one of the plaintiff's prima facie case elements. *Id.* at 381. Upon meeting this burden, the non-moving party must show that one or more of the material facts shown by the moving party to be undisputed is, in fact, genuinely disputed. *Id.*

Appellants divide their argument under point IB into two sections. First, Appellants argue that their routes are [in]tangible personal property which may be the subject of conversion. This section is irrelevant as the trial court did not rely on or challenge this proposition in its judgment. The trial court stated in its judgment that individuals "may have property rights in newspaper distribution routes. *See, Miskimen v. Kansas City Star Co.*, 684 S.W.2d 394 (Mo.App.1984) '...; *Parker v. Pulitzer Publishing Co.*, 882 S.W.2d 245 (Mo.App.1994) ...'" Accordingly, we do not reach and need not address this issue on appeal. Although *Miskimen* suggests that Appellants may have certain rights beyond contractual against Suburban Newspapers,[2] those rights are not found in their conversion cause of action.

■ Appellants argue that Suburban Newspapers converted Appellants' routes when it destroyed their value in 1994. Conversion is the unauthorized assumption and exercise of the right to ownership over personal property of another to the exclusion of the owner's rights. *Manzer v. Sanchez*, 985 S.W.2d 936, 940 (Mo.App. E.D.1999). The following three elements must be established to prove conversion: (1) plaintiff was the owner of the property or entitled to its possession; (2) defendant took possession of the property with the intent to exercise some control over it; and (3) defendant thereby deprived plaintiff of the right to possession. *Id.*

■ The trial court determined that conversion of the routes could not have occurred with regard to the following carriers: (1) those who remained in possession of their routes; (2) those who exercised contractual buy-out clauses transferring their routes to Suburban

**2.** Based on the facts and circumstances in *Miskimen*, the court concluded that application of equitable estoppel was justified to prevent the newspaper company from exercising a termination at will upon notice clause in the carriers' contracts. The court concluded that the newspaper company's attempt to terminate the contracts was almost totally inconsistent with its actual conduct for over ninety years. The court summarized the conduct as follows:

From the 1880's until 1977, the company maintained that the carriers had a proprietary interest in and owned their routes. The company approved of and actively participated in the carriers' practice of selling their routes. It countenanced the practice of the carriers' use of their routes as collateral and until 1977 acknowledged that lenders could have a security interest in such routes. It treated those routes as property subject to being passed to members of a carrier's family upon his death .... Finally, in several instances, it represented in its statements and publications that the carriers owned their routes.

Newspapers; (3) those who abandoned their routes; and (4) those who sold their routes to third parties. Seventy Appellants stipulated to one of the four categories. Nine Appellants not stipulating to one of the four categories subsequently dismissed, with prejudice, their claims. Thirty-nine Appellants neither stipulated nor dismissed their claims, but the trial court found one of the four categories applied to each of them. Appellants do not challenge these factual findings.

■ Assuming Appellants were the owners of their routes or entitled to their possession, they have not shown genuine issues of material fact as to elements two and three of their conversion claim. Conversion requires "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Lacks v. R. Rowland & Co., Inc.*, 718 S.W.2d 513, 520 (Mo.App. E.D.1986). Suburban Newspapers never deprived Appellants of their right to possession or control of their routes. For example, Appellants do not allege that Suburban Newspapers prevented them from distributing newspapers on their routes or in any other way prevented use of their routes by Appellants.

■ Additionally, consent and abandonment are complete defenses to a conversion claim. *Graves v. Stewart*, 642 S.W.2d 649, 650–651 (Mo. banc 1982) (When "an owner expressly or impliedly assents to or ratifies the disposition of his property, there can be no recovery for conversion, as there was no unauthorized conduct regarding the property of the owner."); *City of St. Peters v. Hill*, 9 S.W.3d 652, 655 (Mo.App. E.D.1999) ("Abandonment is a complete defense to a conversion action and precludes recovery.").

As Appellants argue initially, their *routes* are intangible personal property that may be the subject of conversion. Appellants' *routes* were not converted or destroyed by Suburban Newspapers. Suburban Newspapers never took possession of Appellants' routes and Suburban Newspapers never deprived Appellants of possession of their routes. Appellants either had exclusive possession and control over their routes or the routes were voluntarily bought-out, abandoned, or sold.

Accordingly, Suburban Newspapers has shown facts which negate elements two and three of Appellants' conversion claim, and Appellants have not shown that these material facts are genuinely disputed.[3]

Appellants' point IC argues that the trial court erred in dismissing their Count I, tortious interference with an economic expectancy, for failure to state a claim because they properly pled a cause of action for intentional harm to Appellants' businesses.

■ Appellate review of a trial court's grant of a motion to dismiss for failure to state a cause of action is solely a test of the adequacy of the plaintiff's petition. *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 306 (Mo. banc 1993). It assumes that all of the plaintiff's averments are true, and it liberally grants to the plaintiff all reasonable inferences

3. The Missouri Approved Pattern Instruction for Conversion—Taking supports this conclusion. The instruction states:

Your verdict must be for plaintiff if you believe:
First, plaintiff was (here describe facts which entitled plaintiff to possession—e.g. "the owner of the watch," "the lessee of the automobile"), and
Second, defendant *took possession* of (here describe the property) with the intent to exercise some control over (here describe the property), and
Third, defendant thereby *deprived plaintiff of the right to possession* of (here describe the property)
[unless you believe that plaintiff is not entitled to recover by reason of Instruction No. _____ (here insert number of affirmative defense instruction) ]. MAI No. 23.12(1) (emphasis added).

therefrom. *Id.* No attempt is made to weigh any facts alleged as to whether they are credible or persuasive. *Id.* The petition is reviewed to determine if the facts alleged meet the elements of a recognized cause of action, or of a cause that might be adopted in that case. *Id.* However, we do not accept the plaintiff's conclusions. *Arnold v. Erkmann,* 934 S.W.2d 621, 625 (Mo.App. E.D.1996). The defendant bears the burden of establishing that the elements pled by the plaintiff fail to state a cause of action. *Saidawi v. Giovanni's Little Place, Inc.,* 987 S.W.2d 501, 504 (Mo.App. E.D.1999). Plaintiff has no duty to respond to the defendant's motion to dismiss. *Id.*

■■■ The elements of a tortious interference with a business expectancy cause of action are: (1) a contract or valid business relationship or expectancy; (2) the defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) the absence of justification; and (5) damages resulting from the defendant's conduct. *Thomas Phelps Foundation v. Custom Ins. Co., Inc.,* 977 S.W.2d 33, 37 (Mo. App. E.D.1998).

■■■ In its order granting Suburban Newspapers' motion to dismiss Count I, the trial court concluded the following:

> [Appellants] have alleged here only that they own assets that have a market value, that they may wish to sell the assets at some time in the future, and that the actions of [Suburban Newspapers] have reduced or eliminated the market value of the assets. [Appellants] have not alleged that they are currently attempting to sell their routes, that they have entered into negotiations with particular persons in regard to such a sale, or that they have contracts to sell routes. [Appellants'] allegations do not

set them apart from any other person owning an asset which such person may wish to sell at some point in the unspecified future to some unspecified purchaser.[4]

Appellants cite *Bell v. May Dep't. Stores Co.,* 6 S.W.3d 871 (Mo. banc 1999), a case decided after the trial court's order, to support their contention that they were not required "to allege specific purchasers, negotiations, or contracts entered into" in order to allege a " 'business expectancy' in the sale of their routes." *Bell* dealt with a claim of intentional interference with credit expectancy, one type of intentional interference with a business expectancy. *Id.* at 876. In *Bell,* the Missouri Supreme Court defined an expectancy as "that which is expected or hoped for." *Id.* However, this expectancy cannot be too indefinite or remote. *Id.* In stressing that only a valid or reasonable expectancy or credit satisfies the test, the Court concluded that what "constitutes a reasonable chance of obtaining credit is usually a question of fact for the jury to decide where fair-minded persons could disagree." *Id.* at 877.

Appellants alleged facts showing an ongoing market for their routes, of which Suburban Newspapers was aware. Based on these allegations and applying the reasoning of *Bell,* a reasonable jury could find Appellants had a valid business expectancy of selling their routes for similar or greater prices than they paid for them without pleading specific potential purchasers.

Additionally, as already indicated, *Miskimen* suggests that Appellants may have certain rights beyond contractual rights against Suburban Newspapers. Those rights may be found in their tortious interference with an economic expectancy cause of action. Appellants do not allege that the contracts between Appellants and Suburban Newspapers created the alleged expectancy, rather, the expectancy arose from Suburban Newspapers' alleged con-

---

**4.** The trial court also noted that the majority of the allegations in Count I would be more

appropriate in a claim for breach of contract.

duct. In so concluding, we do not find that Suburban Newspapers alleged conduct rose to the same level, and thereby created the same duties, as that described in *Miskimen*. We simply find that a review of Appellants' petition indicates that Appellants alleged facts necessary to meet the elements of a tortious interference with a business expectancy cause of action, and therefore the petition survives a motion to dismiss.[5]

Accordingly, Appellants' point one on appeal is denied in part and granted in part.

Appellants' point two on appeal argues that the trial court erred in dismissing their Count III, property damage, for failure to state a claim because they pled under Section 537.330[6] that their routes were valuable personal property, the values of which were intentionally destroyed by Suburban Newspapers, and the statute, by its terms, applies to the intentional destruction of intangible property.

Appellate review of a trial court's grant of a motion to dismiss for failure to state a cause of action is solely a test of the adequacy of the plaintiff's petition. *Nazeri*, 860 S.W.2d at 306. It assumes that all of the plaintiff's averments are true, and it liberally grants to the plaintiff all reasonable inferences therefrom. *Id.* No attempt is made to weigh any facts alleged as to whether they are credible or persuasive. *Id.* The petition is reviewed to determine if the facts alleged meet the elements of a recognized cause of action, or of a cause that might be adopted in that case. *Id.* However, we do not accept the plaintiff's conclusions. *Arnold*, 934 S.W.2d at 625. The defendant bears the burden of establishing that the elements pled by the plaintiff fail to state a cause of action. *Saidawi*, 987 S.W.2d at 504. Plaintiff has no duty to respond to the defendant's motion to dismiss. *Id.*

Appellants' Count III alleged violations of Section 537.330. This section provides in part:

> Malicious trespass—to personalty—double damages—issuance of attachment, when
>
> If any person shall maliciously or wantonly damage or destroy any personal property, goods, chattels, furniture or livestock, the person so offending shall pay to the party injured double the value of the things so damaged or destroyed ....

The trial court found that although there "is very little case law discussing this statute, ... the title, text and context of this statute indicate that it provides a remedy for a trespass to tangible personal property." Thus, the court concluded that because Appellants did not allege a physical interference with tangible personal property, but rather alleged an injury to contract rights, Appellants had no claim under Section 537.330.

Contrary to Appellants' argument, the statute, *by its terms*, does not apply to the intentional destruction of intangible property. Although the text does not expressly limit the section to tangible personal property, neither does the text expressly apply the section to intangible personal property. We must determine if Section 537.330 applies to both tangible and intangible personal property or is limited to tangible personal property such that Appellants would not have alleged facts necessary to meet the elements of a Section 537.330 cause of action.

When interpreting a statute, our primary role is to ascertain the intent of the legislature from the language used in the statute and, whenever possible, give

---

**5.** Although Appellants do not qualify their pleading of "economic expectancy" with the words "valid" or "reasonable," we liberally construe the pleading to imply such a qualification.

**6.** All statutory references are to RSMo (1994), unless otherwise indicated.

effect to that intent. *Harrison v. King*, 7 S.W.3d 558, 561 (Mo.App. E.D.1999). In determining legislative intent, the words used in the statute are to be considered in their plain and ordinary meaning. *Id.* Absent statutory definition, the dictionary may be used to determine the plain and ordinary meaning. *Am. Healthcare Management, Inc. v. Director of Revenue*, 984 S.W.2d 496, 498 (Mo. banc 1999).

▬ Personal property is defined as any "movable or intangible thing that is subject to ownership and not classified as real property." *Black's Law Dictionary* 1233 (7th ed.1999). A trespass to personal property is defined as a "wrongful taking of chattels." *Id.* at 1509. Chattel is defined as "[m]ovable or transferable property; esp., personal property." *Id.* at 229. Personal chattel is defined as a "tangible good or an intangible right." *Id.*

▬ Where the language of a statute is clear and unambiguous, we will give effect to the language as written and will not resort to statutory construction. *Harrison,* 7 S.W.3d at 561. Although no case has applied Section 537.330 to intangible personal property, nothing appears in the section to prohibit this application, and we find no indication that the legislature intended to limit the section to tangible personal property. Additionally, the dictionary definitions support a plain and ordinary meaning of personal property to include intangible things subject to ownership. Appellants' routes qualify as such personal property.

Respondents cite *State ex rel. Smith v. Greene*, 494 S.W.2d 55 (Mo. banc 1973), to support the trial court's interpretation of Section 537.330. In *Greene*, the Missouri Supreme Court compared Section 537.330 to Sections 537.340 [7] and 537.350 [8] to conclude that the section did not abrogate the common law right of punitive damages.

The issue of whether Section 537.330 applies to both tangible and intangible personal property or is limited to tangible personal property was not before the Court.

Accordingly, we find that Section 537.330 applies to both tangible and intangible personal property, and thus the trial court erred in its conclusion. Appellants alleged facts necessary to meet the elements of a Section 537.330 cause of action. Appellants' point two on appeal is granted.

Appellants' point three on appeal argues that the trial court erred in dismissing the Journal for lack of personal jurisdiction because there was substantial evidence that Patrick Sweeney ("Sweeney") and Suburban Newspapers were acting as agents of the Journal in engaging in the conduct which destroyed the value of Appellants' routes.[9]

▬ The determination of the jurisdictional issue is for the trial court in the first instance, but the sufficiency of the evidence to make a prima facie showing that the trial court may exercise personal jurisdiction is a question of law, which we review independently on appeal. *Stavrides v. Zerjav*, 848 S.W.2d 523, 527 (Mo. App. E.D.1993). When the defendant asserts lack of personal jurisdiction in a motion to dismiss, the plaintiff bears the burden of establishing that (1) the suit arose out of the activities enumerated in the Missouri long-arm statute, Section 506.500; and (2) the defendant has sufficient minimum contacts with Missouri to satisfy due process requirements. *Schilling v. Human Support Services*, 978 S.W.2d 368, 370–71 (Mo.App. E.D.1998).

Section 506.500 provides in part:
Any person or firm, whether or not a citizen or resident of this state, or any corporation, who in person or through an agent does any of the acts enumerat-

---

7. This section deals with trespass to real property.

8. This section deals with removal of fences.

9. Appellants do not contest the trial court's finding that Suburban Newspapers is not the "alter ego" of the Journal.

ed in this section, thereby submits such person, firm, or corporation, and if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of such acts:

...

(3) The commission of a tortious act within this state;

....

■ Appellants argue that the Journal committed a tortious act by "hiring Sweeney as circulation director for the express purpose of cutting the amounts paid to the carriers for stuffing and delivering ... Journal's newspapers, and sending him to St. Louis with express orders to do so ...."

Sweeney testified in his deposition that he met with Robert Jelenic ("Jelenic"), president and CEO of the Journal, and two others at a motel in Rhode Island, at which time he was told:

> We're going to send you down there. We think you can do the job. There are two things you have to do, hire an assistant, renegotiate the contracts. Go to St. Louis, meet with the publisher. If he likes you, you've got the job.

Sweeney further testified that he was told that "primarily, the biggest problem was renegotiation, that the carriers had gotten fat in St. Louis, they were making too much money, they were being overpaid, and that they had implemented contract changes that would correct that matter, ...." Sweeney allegedly was told that Fred Matthias, then circulation director, was "dragging his feet in securing the savings that they wanted on renegotiating the contracts ."

Thomas Rice ("Rice"), president and CEO of Suburban Newspapers, testified in his deposition that he interviewed Sweeney at the request of Jelenic and that he hired Sweeney as an employee of Suburban Newspapers. Sweeney received a letter from Rice indicating his starting salary, and Sweeney understood Rice to be his supervisor. Rice also had the authority to fire Sweeney.

In its order, the trial court stated:

> The Court does not believe that these statements by Mr. Sweeney indicate that he was acting as an agent of Journal in committing tortious acts in Missouri. At most, the statements indicate that Journal hoped Mr. Sweeney, in acting as an employee of Suburban Newspapers, would be able to implement contract changes through renegotiation with the carriers.

Accordingly, the trial court concluded that Appellants failed to meet their burden of showing that the Journal itself committed a tortious act in Missouri that would bring it within the terms of the long-arm statute. We agree with this conclusion.

■ Additionally, to determine whether a non-resident defendant has sufficient minimum contacts for a Missouri court to have personal jurisdiction, the following factors should be considered: (1) the nature and the quality of the contact; (2) the quantity of the contacts; (3) the relationship of the cause of action to the contacts; (4) the interest of Missouri in providing a forum for its residents; and (5) the convenience or inconvenience to the parties. *Schilling*, 978 S.W.2d at 371. The first three factors are of primary importance; the last two factors are of secondary importance. *Id.* If the non-resident defendant has sufficient minimum contacts, the following factors must be considered to determine whether jurisdiction over the defendant would comply with traditional notions of fair play and substantial justice: (1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Id.*

**602**

Appellants do not specifically address the issue of sufficient minimum contacts in their argument for this point, and thus appellate review of this issue is precluded.

Accordingly, Appellants have not established sufficient evidence to make a prima facie showing that the trial court may exercise personal jurisdiction over the Journal.[10] Appellants' point three on appeal is denied.

The judgment of the trial court is affirmed in part and reversed and remanded in part. Costs on appeal are to be split by the parties.[11]

LAWRENCE E. MOONEY, P.J., and PAUL J. SIMON, J., concur.

**10.** Because it concluded that Appellants did not establish that the Journal committed a tortious act in Missouri, the trial court did not reach the due process issue of minimum contacts.

**11.** Respondents' Motion to Dismiss Appellants' Appeal is denied.